## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JAMES A. HARNAGE,
    Plaintiff,

v.

JAMES DZURENDA, et al.,
    Defendants.

No. 3:14-cv-885 (SRU)

## RULING ON MOTION FOR SUMMARY JUDGMENT

James A. Harnage ("Harnage"), currently incarcerated at MacDougall-Walker Correctional Institution, filed this action in 2014, principally alleging that the defendants violated the Equal Protection Clause of the Fourteenth Amendment by affording legal assistance with civil family matters to women incarcerated in Connecticut prisons but not to men. In July 2021, the defendants moved for summary judgment, arguing *inter alia* that Harnage does not have standing to proceed, that his claims are barred by the statute of limitations, that he has failed to demonstrate the personal involvement of any named defendant in a constitutional violation, and that the defendants are entitled to qualified immunity. For the following reasons, certain of Harnage's claims are **dismissed** without prejudice for lack of standing and the motion for summary judgment is **granted**.

## I.    Procedural History

The procedural history in this case is relatively lengthy. Relevant here, Harnage, originally proceeding *pro se*, filed this action in June of 2014. *See* Compl., Doc. No. 1. After I dismissed his original complaint pursuant to 28 U.S.C. § 1915, Harnage filed an amended complaint restating many of the claims dismissed on initial review. *See* Doc. Nos. 6, 10. On January 12, 2015, I issued an order permitting only the claim for a violation of the Equal

Protection Clause to proceed against "defendants Dzurenda, Lantz, Murphy, Salisbury, Foltz and Cepelak." *See* Doc. No. 9 at 5.

In July 2015, the defendants moved to dismiss the Amended Complaint on a number of grounds, arguing that Harnage's claims were barred by the relevant statute of limitations, that he lacked standing to proceed, that his claims failed on the merits, and that they were entitled to qualified immunity. *See* Doc. No. 30. In March 2016, I issued an order granting in part and denying in part the motion to dismiss. *See* Order on Mot. to Dismiss, Doc. No. 58. Specifically, I dismissed without prejudice all claims raised on behalf of other incarcerated individuals; and dismissed with prejudice "any claim made in connection with [Harnage's] 2009 divorce and 2010 termination of parental rights, and all claims against defendants Lantz and Salisbury" as barred by the relevant statute of limitations. *Id.*

Thereafter, Harnage moved to file a Second Amended Complaint. *See* Doc. No. 59. I granted Harnage's motion in June 2016, and simultaneously granted his motion to appoint counsel. *See* Doc. No. 62. The Clerk, however, was never directed to docket that Proposed Amended Complaint, nor was an initial review of that complaint conducted pursuant to section 1915, presumably on the assumption that pro bono counsel would file a Third Amended Complaint. *See* Doc. No. 92. The first attorney appointed in this matter, however, withdrew soon after being appointed, and consequently never filed such a complaint. *See* Doc. No. 94. Although new counsel was appointed in August 2018, *see* Order No. 112, and repeatedly represented that a Third Amended Complaint was forthcoming, no such complaint has been filed. *See* Doc. No. 150, 168.

In July 2021, apparently unclear about which was the operative complaint, the defendants moved for summary judgment on the *first* Amended Complaint. *See* Defs.' Mot., Doc. No. 157.

On January 27, 2022, after repeated discussions with the parties regarding Harnage's intent to file a Third Amended Complaint clarifying the scope of his claims, I held a status conference on the record to address the issue. *See* Mem. of Status Conference, Doc. No. 181. During that status conference, the parties agreed that Second Amended Complaint was the operative complaint, but that, given the overlap between the equal protection claim raised in the Amended Complaint and Second Amended Complaint, I would treat the motion for summary judgment as directed toward the Second Amended Complaint.[1] *Id.* I therefore consider the arguments raised in the defendants' motion for summary judgment as directed toward the Second Amended Complaint.

Finally, I note that counsel for Harnage has filed a three-page "opposition" to the defendants' pending motion for summary judgment, has submitted no evidence in conjunction with the motion, and has inexcusably failed to file a Statement of Facts in Opposition to Summary Judgment (or a statement of Additional Material Facts) as required by District of Connecticut Local Rule 56(a)2. Accordingly, where the defendants' statements of fact are unopposed and supported by record evidence, I will deem them admitted for purposes of this motion. *See* D. Conn. L. Civ. R. 56(a)3 (providing that if a non-moving party fails to provide specific citations to evidence in the record, the Court may "deem[] admitted certain facts [in the movant's Statement of Material Facts] that are supported by the evidence in accordance with Local Rule 56(a)1"); *Martin v. Town of Simsbury*, 505 F. Supp. 3d 116, 124 (D. Conn. 2020) ("Generally, when a party fails to appropriately deny facts set forth in the movant's Local Rule 56(a)(1) Statement, those facts are deemed admitted."); Fed. R. Civ. P. 56(e)(2) ("If a party fails

---

[1] It appears that the allegation in the Second Amended Complaint that Harnage was denied legal assistance to challenge the adoption of his minor daughters is set forth to elucidate the claim that he was denied legal assistance in connection with the termination of his parental rights, *see* Doc. No. 59 at ¶ 8 (explaining the claim). To the extent that Harnage is instead raising a separate claim regarding a denial of legal assistance to challenge the adoption of his daughters, however, the parties agreed that any such claim should be severed and dismissed without prejudice pursuant to Rule 21. *See* Mem. of Status Conference, Doc. No. 181.

to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion"). I note, however, that the Second Amended Complaint constitutes a verified complaint, and to the extent that it relies on personal knowledge and sets forth facts that would be admissible in evidence, I will treat it as an affidavit for purposes of this motion. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (noting that a verified complaint can be treated as an affidavit where it is made on personal knowledge and demonstrates the affiant's competency to testify in the matters set forth in the affidavit); *see also Curtis v. DuBrey,* 2016 U.S. Dist. LEXIS 151981, at \*17 n.8 (N.D.N.Y. Nov. 1, 2016).

## II.    Factual Background

During the time period relevant to this action, the Connecticut Department of Correction ("DOC") afforded incarcerated individuals access to courts by contracting with a private law firm to create the Inmates' Legal Assistance Program ("ILAP"). Defs.' Ex. 8, Doc. No. 157-10 at Ex. A; *see also Smith v. Armstrong,* 968 F. Supp. 40, 45 (D. Conn. 1996) (discussing the creation of ILAP). Under the terms of the 2010 agreement, which was extended by amendment through 2015 and then apparently renewed with a different law firm, private attorneys provided assistance with "claims involving terms and conditions of confinement only, determined…to be matters wherein a prima facie (as defined in Black's Law Dictionary) case is presented, through the preparation of legal documents, research, pleadings, motions, supporting memorandum of law and/or out of court oral and/or written advice." Defs.' Ex. 8, Doc. No. 157-10. The agreement additionally included a provision entitled "Exception for Incarcerated Women," which specified that a full-time attorney would be made available to "represent offenders at York Correctional Institution ("York") in family matters including, but not limited to, divorces, child

4

custody, and DCF proceedings and other civil family matters." *Id.* at ¶ 17. That provision, at the crux of the dispute in the case at bar, stemmed from a consent judgment entered in a class action (*West v. Manson*, 83-cv-366) brought by women incarcerated at the Connecticut Correctional Institution at Niantic ("CCIN"). Among other provisions, the consent judgment in *West* specified that the DOC would provide for an attorney "to represent CCIN inmates in family matters, such as divorces, child custody, DCYS proceedings, and other civil matters." *West v. Manson*, 2017 U.S. Dist. LEXIS 144747, at *2 (D. Conn. Sept. 7, 2017).[2] The ILAP contract fulfilled that obligation by providing legal assistance in civil family matters to women incarcerated at York. *Id.; see also* Defs.' Ex. 9, Doc. No. 157-11.

Harnage, who has been incarcerated since June 2008, is serving a forty-year sentence for various sexual assault and risk of injury crimes involving two of his minor daughters. SAC at ¶ 7; L. R. 56(a)(1) Stmt. at ¶¶ 1-2; Ex. 1 Doc. No. 157-3 at ¶¶ 8-10. On September 24, 2010, standing criminal restraining orders were entered prohibiting Harnage from having any contact with the daughters who were the subject of the criminal case.[3] Ex. 1 Doc. No. 157-3 at Ex. B; *see also* Doc. No. 178-2. The parties agree that those criminal restraining orders are the only restraining orders still in effect, and that "the only available method to modify such a standing criminal protective order is to return to the criminal court and make such a request, and that has not taken place." Pl.'s Mem., Doc. No. 164.

Harnage submits that, in September 2008, he was party to a dissolution of marriage, which became finalized in April 2009, and that the action involved child custody and visitation issues in addition to addressing the division of marital assets. SAC at ¶ 8. In November 2010,

---

[2] CCIN, the facility referenced in the consent decree, was replaced by York Correctional Institution. *See id.* at n.5.
[3] It is not entirely clear whether those orders also apply to Harnage's third daughter, who was not a party to the criminal case; it appears, however, that they do. *See* Doc. No. 178-2; Defs.' Ex. 2, Doc. No. 157-4; *see also Harnage v. Schulman,* 2018 Conn. Super. LEXIS 4442 n.2 (Sup. Ct. 2018).

Harnage's ex-spouse initiated an action to terminate his parental rights; that action became finalized in December 2010. *Id.* at ¶ 9. Harnage claims that he was denied legal assistance in connection with those proceedings, and additionally that he has been denied legal assistance to appeal the divorce and discover or challenge the disposition of his marital and personal property; to challenge the termination of his parental rights and the adoption of his daughters; and to modify the standing criminal restraining orders. *Id.* at ¶¶ 23-32. Although he has repeatedly contacted attorneys with ILAP, he was told that "they could not discuss the civil family matters with Harnage, or represent him therein[] because they were prevented by contract from assisting male inmates with their civil family matters." *Id.* at ¶ 33. Harnage additionally submits that, in July 2015, the DOC renewed the ILAP contract with a different private law firm, but that the disparity between assistance afforded to men versus women persisted. *Id.* at ¶¶ 34-35. In April 2016, Harnage "memorialized yet another request" for assistance to that service provider. *Id.* at ¶ 36.

### III.    Discussion

The defendants submit that they are entitled to summary judgment because Harnage: (1) does not have standing to bring the Equal Protection Claim; (2) the claim is barred by the statute of limitations with respect to defendants Murphy and Foltz; (3) Harnage has failed to demonstrate personal involvement by any of the defendants in an alleged constitutional violation; (4) Harnage's claims fail on the merits; and (5) the defendants are entitled to qualified immunity.

### 1.    Claims and Parties

As discussed, due to counsel's failure to file a Third Amended Complaint, the operative complaint is Harnage's *pro se* Second Amended Complaint. In that complaint, Harnage brings claims against former Commissioner of Correction James Dzurenda; former Commissioner of

Correction Brian Murphy; former Director of Fiscal Services Robert Foltz; and former Deputy

Commissioner for Administration Cheryl Cepelak. SAC at ¶ 2. Dzurenda is sued in his

individual and official capacities; all remaining defendants are sued in their individual capacities

only. *Id.*

As discussed, I previously dismissed with prejudice claims "made in connection with

[Harnage's] 2009 divorce and 2010 termination of parental rights." *See* Order on Mot. to

Dismiss, Doc. No. 58. To the extent that Harnage attempts to reassert claims relating to the

denial of legal assistance in those closed proceedings, those claims will not be considered. In that

same ruling, I also dismissed without prejudice any claims asserted on behalf of other inmates,

given that Harnage was at the time proceeding *pro se*. Subsequently, Harnage "agreed to pursue

the case as an individual action." *See* Doc. No. 92; *see also* Pl.'s Mem., Doc. No. 164 (indicating

that he is not part of any "certified class" and making no mention of representing other

individuals).[4]

Moreover, although Harnage includes a claim for injunctive relief in the Second

Amended Complaint, the defendants have argued that any such claim is rendered moot by an

amendment to the consent decree in *West v. Manson*, *see* Defs.' Mem. Doc. No. 157-1 at 11 n.7,

and Harnage does not contest that in his memorandum in opposition; he instead describes his

claim as one for "money damages for an Equal Protection violation." Pl.'s Mem., Doc. No. 164.

Accordingly, any claim for injunctive relief is deemed abandoned. *See Jackson v. Fed. Express,*

766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when

appropriate, infer from a party's partial opposition that relevant claims or defenses that are not

defended have been abandoned.").

---

[4] Additionally, to the extent Harnage intends to raise state-law claims in the Second Amended Complaint, I decline
to exercise supplemental jurisdiction over those claims and dismiss them without prejudice. 28 U.S.C. § 1367.

2.      **Standard of Review**

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) ("a plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment").

A court ruling on a summary judgment motion must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (cleaned up).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original). Substantive law governs materiality; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are

irrelevant or unnecessary will not be counted." *Id.* at 248. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.*

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In such a situation, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322- 23 (cleaned up); *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied "if he can point to an absence of evidence to support an essential element of nonmoving party's claim"). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

### A.    Standing

The defendants first contend that Harnage has failed to demonstrate that he has standing to bring his equal protection claim because he has failed to identify any "injury or harm that is capable of redress." Defs.' Mem. Doc. No. 157-1 at 12. More specifically, the defendants point out—and Harnage does not dispute—that the protective orders with which Harnage seeks legal assistance can be modified only by a return to *criminal* court. There is additionally no dispute that ILAP attorneys do not afford assistance to either men or women with regard to criminal matters; those matters are handled instead by the Office of the Public Defender. L.R. 56(a)(1) Stmt. at ¶¶ 26-28. Accordingly, the defendants contend, "there has been no gender-based denial of services to [Harnage] in connection with any 'civil family matter,' and thus [Harnage] has not

sustained any 'concrete injury,' let alone any identifiable, actual, or imminent injury." Defs.'
Mem. Doc. No. 157-1 at 10-11.

As a general matter, a plaintiff must satisfy three elements to establish Article III
standing: (1) "a concrete and particularized invasion of a legally protected interest;" (2) "a causal
connection between the invasion and the alleged injury;" and (3) "likelihood that the injury will
be redressed by a favorable decision." *Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 343 (2d
Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Standing must
be established "for each claim and form of relief sought." *Baur v. Veneman*, 352 F.3d 625, 641
n.15 (2d Cir. 2003). To show injury-in-fact in the context of an Equal Protection claim, a
plaintiff must demonstrate that "(1) there exists a reasonable likelihood that [he or she] is in the
disadvantaged group, (2) there exists a government-erected barrier, and (3) the barrier causes
members of one group to be treated differently from members of the other group." *Comer v.
Cisneros*, 37 F.3d 775, 793 (2d Cir. 1994); *see also Roberts v. Bassett*, 2022 U.S. Dist. LEXIS
45775, at *9 (E.D.N.Y. Mar. 15, 2022); *Martinez v. Malloy*, 350 F. Supp. 3d 74, 85 (D. Conn.
2018). The injury-in-fact "is the denial of equal treatment resulting from the imposition of the
barrier, not the ultimate inability to obtain the benefit." *Able v. United States*, 88 F.3d 1280, 1291
(2d Cir. 1996) (cleaned up). In other words, a plaintiff need not demonstrate that she "would
have obtained the benefit but for the barrier" in order to establish that she has suffered an injury-
in-fact. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S.
656, 666 (1993); *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2355 (2020) ("a
plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception that
favors others"). Although the definition of injury-in-fact in the context of an equal protection
claim is therefore somewhat intangible, "'such injury accords a basis for standing only to those

persons who are personally denied equal treatment' by the challenged discriminatory conduct."

*MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 50 (2d Cir. 2017) (quoting

*Allen v. Wright*, 468 U.S. 737, 755 (1984)).

      In my ruling on the defendants' motion to dismiss, I noted that Harnage alleged that he

continued to be subject to a protective order that he needed legal assistance to modify, and

additionally alleged that, "as a result of his gender he is denied the benefit of legal assistance in

civil family matters that the Department of Correction provides to female inmates (and only

female inmates)." Order on Mot. to Dismiss, Doc. No. 58. Contrary to the defendants' assertions,

I did not identify the alleged injury as "being subject to a *civil* restraining order," *see* Doc. No.

157-1 at 9, but instead determined that Harnage plausibly alleged "a concrete injury in the form

of a gender-based denial of services that he wishes to use to address a civil family matter." Order

on Mot. to Dismiss, Doc. No. 58. In other words, Harnage alleged that he had suffered injury by

virtue of unequal treatment in the availability of legal services to assist him with a civil family

matter, rather than that the legal problems *themselves* had caused him harm.

      Although the Second Amended Complaint is no model of clarity, I understand Harnage to

aver that he has repeatedly sought legal assistance with various ongoing civil family matters (in

addition to seeking assistance with the criminal restraining orders) and has been denied access to

that representation solely because he is male. Viewing the evidence in the light most favorable to

Harnage, he has set forth sufficient evidence at this stage of the proceedings to demonstrate that

he has been denied "equal treatment under law, which is a judicially cognizable interest that

satisfies the case or controversy requirement of Article III." *Harrison v. Kernan*, 971 F.3d 1069,

1074 (9th Cir. 2020); *see also Williams v. Lambert,* 46 F.3d 1275, 1280 (2d Cir. 1995)

("[Plaintiff] need not show that she could successfully modify the support agreement if she were

given access to the modification procedure [.] She has standing to seek redress for her claim of a denial of equal access to the modification process."); *Norflet v. John Hancock Fin. Servs.,* 422 F. Supp. 2d 346, 354 (D. Conn. 2006).

With respect to causation, however, the question is somewhat closer. More specifically, Harnage—who, as the party invoking federal jurisdiction, bears the burden of demonstrating its propriety—has set forth no evidence to demonstrate the involvement of the defendants in the alleged injury. Certainly, Harnage's burden is not onerous—"the fairly traceable standard is not equivalent to a requirement of tort causation." *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013); *see also Liu v. United States Cong.,* 834 F. App'x 600, 604 (2d Cir. 2020) (summary order) ("While the requirement that the alleged harm be fairly traceable to the defendant is not an onerous one, a plaintiff must establish some causal relationship between the defendant's conduct and the plaintiff's injury.") (cleaned up). At the summary judgment stage, however, Harnage must "set forth (by affidavit or other evidence) specific facts" which, if taken as true, establish some link between the defendants' conduct and his alleged injury. *Lujan*, 504 U.S. at 561.

Here, the defendants have submitted evidence—which Harnage does not so much as address in his memorandum in opposition to the motion for summary judgment—that at least Dzurenda and Murphy were not in any way involved with the ILAP program, nor did they have any role in determining the scope of services afforded by ILAP attorneys pursuant to its contract with DOC. *See* Doc. No. 157-5; 157-7. On this record, I am therefore unable to conclude that Harnage has met his burden to demonstrate any sort of link between conduct and injury with respect to Murphy and Dzurenda, and any claims against them must be dismissed for lack of jurisdiction. *See, e.g., James v. Willis,* 2022 U.S. App. LEXIS 4314, at *3 (2d Cir. Feb. 17, 2022) (summary order); *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1129 (9th Cir.

2013). With respect to Cepelak and Foltz, however, there is no dispute that Foltz was previously

director of the unit that apparently handled the RFP and contracting process, *see* Doc. No. 157-6;

157-7 at ¶ 5, and that Cepelak signed amendments extending the contract under the same

allegedly unconstitutional terms. *See* Doc. No. 157-8. Accordingly, though the record on this

point is relatively sparse, I will not dismiss claims against those defendants for lack of standing

at this stage of the proceedings. *See, e.g., Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 59 (2d

Cir. 2016) ("a plaintiff's injury need not be directly attributable to a defendant in order to show

the causation element of standing to sue that defendant, so long as the injury is fairly traceable to

that defendant") (cleaned up).

Finally, Harnage satisfies the test for redressability because he has alleged that he

suffered a constitutional violation and would therefore be entitled to at least nominal damages

were he to prevail. *Maxineau v. City of N.Y.*, 2013 U.S. Dist. LEXIS 85396, at *31 (E.D.N.Y.

June 6, 2013) (collecting cases); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801-02

(2021) (holding that, even when a challenged policy has been discontinued, a plaintiff who seeks

nominal damages for a completed violation of a legal right can satisfy the redressability element

of standing). Accordingly, Harnage has standing to proceed with respect to claims raised against

Cepelak and Foltz.

**B.**      **Statute of Limitations**

The defendants additionally contend that Harnage's claims against defendants Murphy

and Foltz are time-barred. As a general matter, Section 1983 includes no statute of limitations,

and federal courts must therefore borrow from state statute of limitations when interpreting

section 1983 claims. *Lounsbury v. Jeffries*, 25 F.3d 131, 133 (2d Cir. 1994). It is well settled that

section 1983 claims arising in Connecticut are governed by the three-year limitations period set

forth in Connecticut General Statutes § 52-577. *Id*. at 132-34. Federal law, however, "determines when a section 1983 cause of action accrues," and the Second Circuit has held that "accrual occurs when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (cleaned up); *see also Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013).

In the case at bar, the defendants submit evidence that Murphy, who served as Interim Commissioner of Correction between 2009 and 2010 and as Deputy Commissioner for Operations between 2003 and 2009, retired from the DOC in 2010. L. R. Stmt. at ¶ 9; Murphy Decl. Doc. No. 157-5. Foltz, who previously served as Director of Fiscal Services (or Chief Financial Officer), retired effective May 31, 2011. L. R. Stmt. at ¶ 11; Miller Decl., Doc. No. 157-6. Accordingly, the defendants contend, the latest that any claims against those defendants related to their official duties as Commissioner and Director could have accrued was the date of their retirement, which was more than three years prior to the filing of this action in June 2014. *See* Compl. Doc. No. 1. In his memorandum in opposition to the motion for summary judgment, Harnage does not address that argument, nor does he set forth any facts to suggest that the statute of limitations for claims against those defendants should be tolled.

In light of the undisputed evidence that Murphy and Foltz retired from their positions more than three years prior to the date that Harnage filed this action, I agree with the defendants that any claims against those defendants are time-barred.[5]

### C.   Personal Involvement

The defendants additionally contend that Harnage has failed to demonstrate the requisite degree of personal involvement to state a cognizable section 1983 claim against Dzurenda or

---

[5] Accordingly, even assuming Harnage had sufficiently demonstrated that he has standing to proceed with respect to the claims raised against Murphy, those claims are time-barred.

Cepelak. Prior to addressing that argument, I note that Harnage has sued Dzurenda in his official as well as in his individual capacity. The Eleventh Amendment to the United States Constitution, however, bars a suit in federal court against a state or one of its agencies absent the state's explicit consent to suit or Congress's explicit abrogation of state immunity. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 99-100 (1984). That immunity also protects state officials sued for damages in their official capacities. *Kentucky v. Graham*, 473 U.S. 159 (1985). Accordingly, even if Harnage has standing to pursue his claims against Dzurenda, any official capacity claims for damages are plainly barred by the Eleventh Amendment. *See Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 193 (2d Cir. 2015); *see also Coniff v. Vermont,* 2013 U.S. Dist. LEXIS 143494, at *38 (D. Vt. Sept. 30, 2013) ("sovereign immunity may be raised at any point in the proceeding: on appeal, in summary judgment motions, even by the Court *sua sponte*"); *Benoit v. State DMV*, 2012 U.S. Dist. LEXIS 2011, at *8 (D. Conn. Jan. 6, 2012).

With respect to personal involvement, Harnage alleges that the defendants created "a state policy to allow female inmates the right to legal assistance and representation" by contracting with ILAP to afford civil legal assistance with family matters solely to women; and knew or should have known that Harnage would be harmed as a result of that policy. SAC at ¶¶ 15-22. The crux of Harnage's allegations therefore appears to be that the defendants, in their role as high-ranking officials, either created or perpetuated a policy under which only incarcerated women would be afforded access to legal services for civil family matters.

Recently, in *Tangreti v. Bachman*, the Second Circuit reexamined the requirements for holding a supervisory defendant liable under section 1983, clarifying that "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-

official defendant, through the official's own individual actions, has violated the Constitution.'"

983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). More

specifically, "[t]he focus is on what the *supervisor* did or caused to be done, 'the resulting injury

attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no

less than the *mens rea* required of anyone else.'" *Id.* (quoting *Porro v. Barnes*, 624 F.3d 1322,

1327-28 (10th Cir. 2010)).[6]

Prior to the Second Circuit's decision in *Tangreti*, personal involvement of a supervisory

official for purposes of section 1983 could be shown by setting forth evidence that

> (1) the defendant participated directly in the alleged constitutional violation, (2) the
> defendant, after being informed of the violation through a report or appeal, failed to remedy
> the wrong, (3) the defendant created a policy or custom under which unconstitutional
> practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant
> was grossly negligent in supervising subordinates who committed the wrongful acts, or (5)
> the defendant exhibited deliberate indifference to the rights of inmates by failing to act on
> information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). District courts in this Circuit have, for the

most part, read *Tangreti* to abrogate that test, requiring instead that the elements of each

constitutional claim be pleaded and proven against each defendant. *See, e.g., Stone v. Annucci*,

2021 U.S. Dist. LEXIS 186195, at *26 (S.D.N.Y. Sept. 28, 2021) ("Although it is true

that *Tangreti* did not expressly state, '[w]e are overruling *Colon*,' it made clear that plaintiffs

seeking to hold supervisors liable cannot rely on a separate test of liability specific to

supervisors—i.e., exactly what the five-factor *Colon* test was.") (cleaned up) (collecting cases).

*Tangreti*, however, was concerned with allegations that a particular defendant had been

grossly negligent in supervising subordinates who committed wrongful acts or failed to act on

---

[6] Notably, *Tangreti* was decided *after* Harnage filed the Second Amended Complaint. As indicated, however, Harnage has had ample opportunity to amend his complaint in the aftermath of the Second Circuit's decision in *Tangreti*.

information demonstrating those acts were occurring, and did not have occasion to address the scope of liability under section 1983 for creation or continuance of a policy under which unconstitutional practices occurred. 983 F.3d at 614. As other courts have recognized, imposing liability for a defendant's role in creating or perpetuating an unconstitutional policy is not necessarily inconsistent with *Tangreti* (or, for that matter, *Iqbal*) so long as the defendant's actions—not those of her subordinates—afford a basis. *See, e.g., Stone*, 2021 U.S. Dist. LEXIS 186195 at *30 ("the principle that policymakers can still be liable under Section 1983 after *Iqbal* is consistent with the case law, including post-*Tangreti* district court decisions and the decisions of other Courts of Appeals.") (collecting cases); *see also Meli v. City of Burlington,* 2022 U.S. Dist. LEXIS 25907, at *42-43 (D. Vt. Feb. 14, 2022) ("while a supervisor cannot be found liable alone by reason of his supervision of others who committed the violation, it seemingly remains possible for a policy maker to be held liable for their creation or continuance of an unconstitutional policy or custom") (cleaned up); *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (concluding, after *Iqbal*, that "[section] 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution") (cleaned up) (collecting cases).

In the case at bar, the essence of Harnage's claim appears to be that the defendants violated the equal protection clause either by entering into or renewing an agreement providing civil legal services solely to women. In theory, then, Harnage seeks to impose liability for the defendants' own actions in creating or perpetuating a gender-based disparity in the provision of

legal services, and his claims are not foreclosed by *Tangreti*. As discussed, however, the defendants have submitted admissible evidence in the form of a declaration, in which Dzurenda avers that he "had no involvement in any contracts or requests for proposal (RFP) or any aspect of the Inmate Legal Assistance Program (ILAP)." Decl. of Dzurenda, Doc. No. 157-7 at ¶ 4. Dzurenda further submits that he had "no personal involvement in either contracting for ILAP or in reviewing ILAP programs and services, all of which was under the administration of either the Director of Programs and Treatment or the Fiscal Services Unit, specifically the grants and contract administrator." *Id.* at ¶ 10. In his memorandum in opposition to the motion for summary judgment, Harnage does not address the defendants' arguments or set forth evidence to suggest that Dzurenda was involved in any way in the decision to provide additional legal assistance solely to women. As a result, even if he has standing to proceed against Dzurenda, Harnage has failed to demonstrate that Dzurenda so much as approved the contract, and therefore has failed to demonstrate the requisite degree of personal involvement in an alleged constitutional violation.

With respect to Cepelak, the question is somewhat closer. Significantly, the defendants have set forth evidence that Cepelak signed three amendments to the 2010 contract in her role as Deputy Commissioner for Administration. Those amendments—signed in 2012, 2014, and 2015, respectively—extended the duration of the agreement with the provision affording legal services for civil family matters solely to women. Hubert Decl., Doc. No. 157-10 at ¶ 4 and Exs. A-D; *see also* Cepelak Decl., Doc. No. 157-8 at ¶ 5. The defendants additionally submit Cepelak's affidavit, however, in which she avers that she "was not involved in the detailed Request for Proposals (RFP) process for the ILAP contract and I was not involved in drafting any of the specific provisions of the 'scope of services' listed within the ILAP contract. Indeed, that was RFP process was completed in 2010, before I had become Deputy Commissioner."

18

Cepelak Decl., Doc. No. 157-8 at ¶ 6. Cepelak further maintains that she did not review the

contract amendments for legal sufficiency prior to signing, and additionally that she was "never

made aware of the contents of plaintiffs numerous complaints [] nor did [she] have any

knowledge of the plaintiff's specific allegations of various issues, until after the commencement

of this lawsuit." *Id.* at ¶¶ 7, 4. According to Cepelak, all details related to the contract were

managed by an Administrative Manager in a unit of the Fiscal Services Division (which she

oversaw). *Id.* at ¶¶ 2-3.

    As discussed, the Second Amended Complaint sets forth only conclusory statements that

Cepelak participated in the creation of a policy under which he was denied equal protection, and

that she knew or should have known that he would suffer harm as a result. Moreover, in his

memorandum in opposition to the motion for summary judgment, Harnage does not address the

defendants' arguments that he has failed to demonstrate the requisite degree of personal

involvement, nor has he set forth any evidence with respect to Cepelak's involvement in the

contracting process. In my view, absent some evidence demonstrating that Cepelak participated

in formulating the terms of the agreement or renegotiating its provisions each time it was

extended by amendment—rather than merely signing the agreement on behalf of the DOC—

Harnage has failed to sufficiently demonstrate that Cepelak herself participated in the alleged

constitutional violation. *Cf. Pugh v. Goord,* 571 F. Supp. 2d 477, 513 (S.D.N.Y. 2008) (holding

that a supervisory defendant was "personally involved in the alleged violations" where plaintiffs

set forth evidence that he "had approved the decision to implement [the policy]…and he was

clearly aware that [the policy] denied Shi'ite inmates separate services"); *see also Rossi v.

Fishcer,* 2015 U.S. Dist. LEXIS 22348, at *47 (S.D.N.Y. Feb. 24, 2015) (refusing to dismiss

claim for lack of personal involvement where "plaintiff has plausibly alleged that [the]

defendants…were involved in creating policies under which his right to free exercise was substantially burdened."); *Dodds*, 614 F.3d at 1200 ("Where an official with policymaking authority creates, actively endorses, or implements a policy which is constitutionally infirm, that official may face personal liability for the violations which result from the policy's application.") (cleaned up).

## III.   Conclusion

In sum, even if Harnage has demonstrated an Equal Protection violation with respect to the provision of civil legal services in civil family matters to women and not men incarcerated in Connecticut prisons, he has failed to meet his burden to overcome summary judgment with respect to any of the defendants named in this action. Accordingly, I need not reach the defendants' alternative arguments in favor of their motion for summary judgment. The claims raised against Dzurenda and Murphy are **dismissed** without prejudice for lack of standing and the motion for summary judgment is **granted** with respect to the claims raised against Cepelak and Foltz. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) ("Without jurisdiction a court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case."); *see also Bhatnagar v. Parsons Sch. of Design at the New Sch.*, 2022 U.S. Dist. LEXIS 13637, at *6 (S.D.N.Y. Jan. 21, 2022) ("Where a plaintiff lacks standing to bring a claim, the claim must be dismissed without prejudice because, without jurisdiction, the court lacks the power to dismiss with prejudice."). Although those claims are dismissed without prejudice, I note that any motion to amend would be both futile and prejudicial to defendants given the length and procedural

history of this case. *See Diaz v. Local No. 241, Transp. Workers Union of Am.*, No. 17cv8898, 2021 U.S. Dist. LEXIS 52222, at *30 (S.D.N.Y. Mar. 19, 2021).

      The clerk is directed to enter judgment for the defendants consistent with the terms of this order and close the case.

      So ordered.

Dated at Bridgeport, Connecticut this 31st day of March 2022.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
